UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
DANICA HARRY o/b/o M.G.B.,

            Plaintiff,

                                            **MEMORANDUM AND ORDER**

  - against -                                  19-CV-7180 (RRM)

COMMISSIONER OF SOCIAL SECURITY,

            Defendant.
----------------------------------------------------------------x
ROSLYNN R. MAUSKOPF, United States District Judge.

       Plaintiff Danica Harry, on behalf of M.G.B., brings this action against the Commissioner

of Social Security (the "Commissioner"), seeking review of the Commissioner's determination

that M.G.B. was not disabled and, therefore, not eligible for disabled child's Social Security

Insurance ("SSI") benefits.  Harry and the Commissioner now cross-move for judgment on the

pleadings pursuant to FED. R. CIV. P. 12(c).  (Def.'s Mot. (Doc No. 13); Pl.'s Mot. (Doc No.

25).)  For the reasons set forth below, the Commissioner's motion is denied and Harry's motion

is granted to the extent it seeks remand.

## BACKGROUND

       M.G.B. was born in October 2010 and was five years old when Harry filed an application

for SSI benefits on her behalf.  Tr. 67, 164.[1]

Medical and Educational Evidence

       Dr. Weinian Luo, school psychologist, evaluated M.G.B. on October 27, 2015, due to her

mother's concerns that she required speech services.  Tr. 281–86.  M.G.B. was five years old and

attended general education kindergarten classes.  Tr. 281.  Dr. Luo observed that M.G.B. was a

---

[1] Citations preceded by "Tr." cite to the Administrative Record (Doc. No. 15) and use original pagination.  All other citations use page numbers assigned by the Electronic Case Filing ("ECF") system.

very sweet and happy child who was very cooperative.  Tr. 281.  She sat still and focused on tasks during testing, though sometimes she got excited and sang while working.  *Id*.  Her attention span was adequate when work was easy for her.  *Id*.  However, her performance skills were scattered and her work skills were inconsistent.  *Id*.  M.G.B.'s full scale IQ score, based on the Weschler Preschool & Primary Scale of Intelligence, Fourth Edition ("WPPS-IV"), was in the lower end of the low-average range and was well below age expectancy.  Tr. 281, 284.  M.G.B.'s verbal comprehension score was within the borderline range and suggested significantly delayed verbal ability.  Tr. 281, 283.  Her visual spatial score was within the low average range.  Tr. 281, 284.  Dr. Luo assessed that M.G.B.'s significantly delayed skills in verbal comprehension and visual spatial ability had a severe impact on her academic development in subjects that require language skills and nonverbal reasoning.  Tr. 284.  Dr. Luo also assessed that M.G.B.'s letter recognition and sight words were well below average, she could not read short phrases, she lacked comprehension skills, her picture vocabulary skills were below grade expectation, and she could not write any letters.  Tr. 284.  Dr. Luo noted that M.G.B. would likely have trouble focusing in a "big class setting."  Tr. 283.

Shoshana Reich, a speech language pathologist, evaluated M.G.B. on November 5, 2015.  Tr. 274–280.  Reich summarized the observations of M.G.B.'s kindergarten teacher, Ms. Nesser, who referred to M.G.B. as a "non-reader" and stated that she was "struggling across the board" with academics.  Tr. 275.  Reich noted that MG.B. was a friendly and sweet child and was alert and cooperative throughout the testing session.  Tr. 275.  Reich observed that M.G.B. was fidgety and impulsive and it appeared that she was guessing answers during the testing session.  *Id*.  Reich administered the Clinical Evaluation of Language Fundamentals, Fifth Edition ("CELF-5").  Tr. 276.  M.G.B. scored in the 50th percentile in her ability to understand simple

2

and complex sentences; the 50th percentile in ability to understand and apply word structure rules; the 50th percentile in ability to speak complete, semantically and grammatically correct sentences; the 25th percentile in ability to recall simple and complex spoken sentences; and the 39th percentile in overall core language ability. Tr. 276–78. Overall, M.G.B.'s core language score fell on the low end of the average range, suggesting language skills that were age appropriate. Tr. 278. Reich also conducted an informal language evaluation and observed that M.G.B. initiated and maintained conversations appropriately, responded to questions with related responses, and exhibited appropriate reactions and expressions. Tr. 279. Reich concluded that speech and language intervention were not warranted at that time but suggested modifications to the classroom environment to encourage M.G.B. to remain engaged and to practice her language skills. Tr. 275.

Dr. Luo re-evaluated M.G.B. on March 29, 2016, to assess her progress. Tr. 285–86. Dr. Luo assessed that M.G.B.'s letter recognition and sight words were on grade level and within the average range. Tr. 285–86. Her spelling skills were within the average range. *Id*. She could not read or comprehend any short phrases, and her vocabulary and picture vocabulary were below grade expectation. *Id*. M.G.B. could not perform single digit addition and her calculation skills were below grade expectation. *Id*. Dr. Luo assessed that M.G.B.'s delayed language skills and number knowledge affected her ability to learn new math concepts in a general education setting without intensive supports. *Id*.

In an Individualized Education Program ("IEP") report dated November 17, 2015, and to be implemented on April 19, 2016, (the "April 2016 IEP"), the Committee on Special Education ("CSE") determined that M.G.B. was a student with a learning disability. Tr. 287. She was five-and-a-half years old and a kindergarten student. Tr. 289. As to M.G.B.'s academic achievement,

3

the CSE noted that her full scale IQ score on the WPPS-IV was well below age expectancy and her verbal comprehension score suggested significantly delayed verbal ability. Tr. 287. The CSE further noted that overall, M.G.B. did not know sight words, could not read or comprehend short phrases, had a vocabulary below age and grade expectancy, lacked reading comprehension skills, and exhibited difficulty in counting and writing numbers. Tr. 287–89. The CSE noted that M.G.B. was friendly, polite, and played well with others, though she sometimes cried when she did not get her way or when she struggled with activities. Tr. 289. When called on to share her thoughts with the class, M.G.B. would "often stutter and become visibly upset (tear up, pick her fingers) and frustrated." Tr. 288. Her attention span was adequate, she completed tasks, she responded well to reinforcement, and she was respectful to her teachers and other building staff. Tr. 289. During testing, she occasionally stood up and looked around but could be redirected. *Id*. Her mother reported that M.G.B. socialized well and had friends. *Id*. As to her physical development, the CSE noted that M.G.B. was well-behaved, healthy, and enjoyed physical activities. *Id*. She demonstrated fine and gross motor skills that were below age-appropriate level and she exhibited difficulty with spatial awareness. *Id*. Based on the foregoing, the CSE recommended that M.G.B. receive small group instruction in English, Math, and Social Studies, with special education supports, and occupational therapy. Tr. 290, 297.

Harry filed the application for SSI benefits on M.G.B.'s behalf on August 4, 2016, alleging disability due to learning disorder and ADHD and a disability onset date of October 25, 2013. Tr. 67, 138. She listed Dr. Jose Villarin as her daughter's treating physician from November 2010 through the present. Tr. 168. In a function report dated August 5, 2016, Harry reported that Dr. Villarin said that M.G.B. needed glasses but she did not yet have them. Tr. 156. Harry stated that M.G.B.'s speech could "hardly ever" be understood by people who did

not know the child well, but that people who knew her well understood her speech "most of the time." Tr. 157. M.G.B. could talk with family, deliver telephone messages, and explain why she did things, but could not tell jokes or riddles accurately, repeat stories she had heard, or talk with friends. Tr. 158. Her mother described her as "antisocial, not friendly." *Id*. Her mother also noted that M.G.B. "does not listen," needs constant direction, and "must be supervised at all times." Tr. 162–63. Harry stated that M.G.B. "has a bad tantrum." Tr. 163. In a questionnaire she completed on August 11, 2016, Harry stated that M.G.B. was "very hyperactive," could not sit still, stuttered "a lot" and took "time to get her words out," could play well alone but not with others, and had "bad tantrums." Tr. 180. Harry noted that she dressed and washed M.G.B. *Id*.

Steven Tsoutsouras, M.D., conducted a consultative pediatric examination on September 21, 2016. Tr. 264–67. Harry told Dr. Tsoutsouras that M.G.B. had a history of learning disabilities and attention deficit hyperactivity disorder ("ADHD") and was attending special education classes. Tr. 264. M.G.B. was not taking any medications. *Id*. M.G.B.'s typical daily activities consisted of watching television, listening to music, playing, doing homework, reading, coloring, drawing, and playing on the computer. Tr. 265. Her vision was 20/30 in both eyes without glasses. *Id*. Upon examination, M.G.B.'s speech and behavior were normal for her age, she had a normal gait, and she needed no help getting on and off the exam table. *Id*. She was tall for her age but the physical examination was otherwise unremarkable. *Id*. M.G.B. had normal muscle strength, range of motion, reflexes, and sensations throughout her arms and legs. Tr. 266. Her hand and finger dexterity were intact and she demonstrated full grip strength bilaterally. *Id*. Dr. Tsoutsouras diagnosed a learning disability and ADHD. Tr. 266–67.

Brittany Falesto, M.G.B.'s special education teacher, completed a teacher questionnaire on September 28, 2016. Tr. 187–94. She had known M.G.B. for one year and spent about six

hours per day with her.  Tr. 187.  M.G.B. was in the first grade.  *Id*.  Falesto noted that M.G.B.'s reading and math levels were at a pre-kindergarten or early kindergarten level and written language was at the kindergarten level.  *Id*.

Falesto assessed M.G.B. in ten areas of "acquiring and using information."  Tr. 188. Falesto noted that overall, M.G.B. had an "obvious problem" in this domain.  *Id*.  Falesto determined that M.G.B. had no problems comprehending oral instructions or understanding and participating in class discussions; a "slight" problem applying problem-solving skills in class discussions; "obvious" problems understanding school vocabulary, reading and comprehending written material, and learning new material;  "serious" problems comprehending and doing math problems, providing organized oral explanations and adequate descriptions, and recalling and applying material previously learned; and a "very serious" problem expressing ideas in written form.  *Id*.  Falesto noted that M.G.B. participated during lessons, but that her thoughts and language were "frequently disorganized."  *Id*.  She also noted that M.G.B. "often confuses letter sounds and #'s" and "needs a lot of assistance when writing."  *Id*.

Falesto also assessed M.G.B. in thirteen areas of "attending and completing tasks."  Tr. 189.  Falesto did not provide an overall rating for this domain.  She reported that M.G.B. had no problems paying attention when spoken to directly, waiting to take turns, carrying out single-step instructions, switching from one activity to another without being disruptive, or working without distracting herself or others.  *Id*.  Falesto rated M.G.B. as having a slight problem in six areas: sustaining attention during play or sports activities, focusing long enough to finish an assigned activity or task, refocusing to a task, carrying out multi-step instructions, organizing her things or school materials, and working at a reasonable pace or finishing on time.  *Id*.  Falesto found that M.G.B. had an obvious problem completing class or homework assignments and completing

6

work accurately without careless mistakes, and noted again that M.G.B. needed "a lot of help with writing" and "sometimes rushes and makes careless mistakes." *Id*.

Falesto reported that M.G.B. had no problems in the domain of interacting and relating with others, no problems moving about and manipulating objects, and no problems caring for herself. Tr. 190–92. As to the domain of health and well-being, Falesto stated that M.G.B. did not have any medical condition that interfered with her functioning at school and did not frequently miss school due to illness; she did not know if M.G.B. was prescribed or was taking any medication. Tr. 193.

Mindy Singer, a speech and language pathologist, consultatively evaluated M.G.B. on September 29, 2016. Tr. 268–70. She noted that M.G.B. was a friendly, outgoing child. Tr. 268. M.G.B. readily engaged with Singer and attended to tasks appropriately. *Id*. Singer noted that M.G.B.'s responses were thoughtful and deliberate but she noted mild distractibility as the evaluation progressed. *Id*. Singer assessed M.G.B.'s communication skills as fair and attention and focus skills as adequate. Tr. 270. Results from application of CELF-5 indicated normally developing receptive and expressive language skills and Singer concluded that M.G.B. did not require speech and language services. *Id*.

S.Ghandi, M.D., a state agency pediatric consultant, reviewed the evidence of record on October 11, 2016, and concluded that M.G.B.'s learning problems and ADHD did not meet, medically equal, or functionally equal, any listed impairment. Tr. 73–74. In making this determination, Dr. Gandhi also assessed M.G.B.'s degree of limitation in the six functional domains. Dr. Gandhi assessed less than marked limitations in the domains of acquiring and using information, moving about and manipulation of objects, attending and completing tasks,

7

and interacting and relating with others.  Tr. 72–73.  Dr. Gandhi assessed no limitations in the

domains of caring for herself and health and physical wellbeing.  Tr. 73.

A state agency initially denied the application on October 11, 2016.  Tr. 77–81. Harry

thereafter requested a hearing before an Administrative Law Judge ("ALJ").  Tr. 83.

In an IEP report dated November 15, 2016, (the "November 2016 IEP"), to be

implemented the following day, the CSE continued to refer M.G.B. to a special education

program consisting of special classes in Math, English, and Social Studies, as well as

occupational therapy.  Tr. 197–209.  The IEP noted that M.G.B. was reading at a middle

kindergarten level, could write the majority of her letters without prompting, and had a difficult

time copying words and sentences from charts or other papers on her desk.  Tr. 197.  In math,

she could recognize one to ten and had a 1:1 correspondence up to 20.  *Id*.  She sometimes

reversed digits and struggled with number stories.  *Id*.  Socially, M.G.B. was a friendly, polite

child who played well with other students and was responsive toward authority.  *Id*.  M.G.B.'s

abilities to sustain attention, concentrate, and exert mental control were adequate in a one-to-one

setting for some tasks.  *Id*.

In an IEP report dated October 24, 2017, and to be implemented on November 8, 2017,

(the "November 2017 IEP"), the CSE continued to classify M.G.B. as a student with a learning

disability.  Tr. 324.  M.G.B. was a second grade student performing on a first grade level.  *Id*.

She easily followed directions, completed tasks on time, and transitioned between activities

without assistance throughout the day.  *Id*.  She struggled in all academic areas due to difficulties

in decoding, memory, and spelling.  *Id*.  Regarding social development, the CSE noted that

M.G.B. was a very social student, a good friend to her peers, and always helped teachers.  Tr.

325.  As to physical development, the CSE noted that M.G.B. was very agile, demonstrated

8

strong gross motor skills, and did not tire during the day.  Tr. 325.  The CSE referred M.G.B. to a special education program consisting of special classes in math and English language arts, as well as occupational therapy twice a week.  Tr. 331.  Due to her academic and memory needs, M.G.B. required a 12:1:1 setting.  Tr. 336.

The ALJ made a first attempt to obtain records from treating physician Dr. Villarin on June 8, 2018, and followed up on June 22, 2018.  Tr. 349–50.  No records from Dr. Villarin were entered into the record and there is no evidence that the ALJ served Dr. Villarin with a subpoena after he failed to respond to her requests.

Hearing Before the ALJ

On October 1, 2018, Harry appeared, *pro se*, for a hearing before ALJ Gloria Pellegrino, which lasted for 29 minutes.  Tr. 44–66.  At the start of the hearing, ALJ Pellegrino informed Harry that she had a right to representation at the hearing and asked whether she would prefer to postpone the hearing to give her time to obtain counsel, including free legal representation.  Tr. 46.  Harry stated that she understood that she had a right to representation and consented to proceeding without representation.  *Id*.  Harry testified that at the time of the hearing, M.G.B. was in third grade and attending special education classes.  Tr. 52.  She lived with her mother and brother, who was seventeen years old and attending special education high school classes. Tr. 52–53.  M.G.B. received speech therapy at school three days per week where she was removed from the classroom and placed in a small group setting but received no other therapy outside of school.  Tr. 54.  Harry testified that she had a letter from the school speech therapist but had forgotten to bring it to the hearing.  *Id*.  Harry also stated that her child saw a doctor "regularly" but provided no information about those visits.  Tr. 55.  When asked whether M.G.B. had behavioral problems, Harry said no, but she did have "emotional problems."  *Id*.

9

Specifically, M.G.B. was "always crying" and would "start tearing up" while doing her homework with her mom or when other children were able to do assignments that she could not. Tr. 55, 57. Harry stated that she herself had struggled with a learning disability and understood what her daughter was experiencing and tried to help her as much as she could. *Id.* Harry also said that M.G.B. could talk to her but often seemed "afraid" to tell her how she was feeling. Tr. 55–56. She testified that M.G.B. loved her brother and cousins and had friends at school but that she did not allow her daughter to play with children in the neighborhood out of concern for her safety. Tr. 56–57. Harry testified that M.G.B. had never been prescribed medication and that she did not believe in medications. Tr. 57.

Sree Devi Chandrasekhar, M.D., a pediatrics and family medicine specialist, also testified at the hearing. Tr. 58–65. The ALJ asked Dr. Chandrasekhar whether, in reviewing the record evidence, she had "sufficient medical evidence to establish the presence of any medically determinable impairment in this case?" Tr. 60. Dr. Chandrasekhar answered, "Yes. Yeah. I feel that way. Yeah." *Id.* However, when asked to list the impairments, Dr. Chandreskhar gave a brief summary of each document in the record and then stated, "Actually, you know, the records do not give me enough information to come to a determination." Tr. 62. She also said, "I really cannot be very sure what her IQ is." *Id.* The ALJ again asked, "Are there anything in the records that establishes any impairments, any diagnosis of impairments?" *Id.* Dr. Chandrasekhar said, "Yes. That's an intellectual problem for low full-scale IQ. That's it." *Id.* The doctor testified that there was no proof of ADHD in the record, such as an examination by a treating physician or pediatric psychiatrist, so she could not "technically say yes" to the diagnosis of ADHD. Tr. 62–63. Dr. Chandrasekhar stated that in her opinion, none of M.G.B.'s medically determinable impairments met or medically equaled the Listings. Tr. 63.

10

The ALJ next asked Dr. Chandrasekhar whether M.G.B. was impaired in any of the six domains used to evaluate disability in children.  *Id.*  For the first domain, attending and using information, she assessed "less than marked limitation because of the low IQ."  *Id.*  The doctor explained that this assessment was based on a "report of learning disability in the IEP" and cited to the November 2016 IEP and the November 2017 IEP.  Tr. 63–64.  For the second domain, attending and completing tasks, Dr. Chandrasekhar assessed "less than marked for the same reason."  Tr. 64.  For the remaining domains, Dr. Chandrasekhar assessed no limitation and cited to no evidence in the record to explain this assessment.  Tr. 64.  The ALJ then asked Dr. Chandrasekhar whether she had observed any conflicts or inconsistencies in the record evidence. *Id.*  The doctor identified disagreement between the April 2016 IEP, which notes that M.G.B. stuttered and became frustrated while speaking, and the report of the speech pathologist, who found normal speech development.  Tr. 64–65.  Dr. Chandrasekhar stated that because the speech pathologist was a "specialist, I would take her examination as authentic."  Tr. 65.  The ALJ then asked Harry if she had any questions for the doctor, and she said no.  *Id.*  The ALJ stated that she had no other questions at that time and concluded the hearing.  *Id.*

The ALJ's Decision

On November 6, 2018, the ALJ issued an unfavorable decision, finding that M.G.B. was not disabled and therefore not entitled to supplemental social security income.  Tr. 24–38.  To make this determination the ALJ followed the three-step analysis set forth at 20 C.F.R. § 416.924, which is as follows.  At step one, the ALJ must determine whether the child has engaged in substantial gainful activity since the alleged onset date.  *Id.*  At step two, the ALJ must determine whether the child has a medically determinable impairment or combination of impairments that is severe.  *Id.*  At step three, the ALJ must determine whether the severe

impairments, separately or in combination, "meet, medically equal, or functionally equal" one of more of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). *Id*.

In determining whether an impairment "functionally equals" a listed impairment, the ALJ evaluates the claimant's functioning in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). To functionally equal a listing, the claimant's impairment must produce a "marked" limitation in at least two domains or an "extreme" limitation in at least one domain. 20 C.F.R. § 416.926a(a). A "marked" limitation exists when a child's impairment "interferes seriously" with her ability to initiate, sustain, or complete activities independently, and is "more than moderate" but "less than extreme." 20 C.F.R. § 416.926a(e)(2). A child's impairment is an "extreme limitation" when it "interferes very seriously" with her ability to initiate, sustain, or complete activities independently, and is "more than marked." 20 C.F.R. § 416.926a(e)(3).

At step one, the ALJ found that M.G.B. was a school-age child on the date that the application was filed and as of the date of the decision and had not engaged in substantial gainful activity since the application date. Tr. 27. At step two, the ALJ found that M.G.B. had the following severe impairments: a "learning disorder" and ADHD. *Id*. The ALJ wrote, "These conditions cause limit [*sic*] the claimant's ability to perform activities in specific functional domains." The ALJ also considered whether M.G.B.'s alleged speech delays constituted a severe impairment, but concluded that they did not, noting that "no related function difficulties were found for this condition" and that both Dr. Singer and Dr. Luo "agreed that the claimant has normal speech development and no related services were needed." *Id*.

At step three, the ALJ found that M.G.B. did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. *Id*. The ALJ specifically considered Listing 102.10B(3) for hearing loss but determined that she did not meet the test result requirements. *Id*. The ALJ also considered Listings 112.05, Intellectual Disorders, and 112.11, Neurodevelopmental Disorders. *Id*. The ALJ stated, however, that "it was the opinion of Dr. Chandrasekhar that the claimant does not meet the listing requirements, and does not meet the Part B requirements of at least two marked limitations or one extreme limitation in the stated categories. In addition, IQ test results seen in the school records do not meet the specific requirements of Listing 112.05." Tr. 27–28. The ALJ found that M.G.B. had the following functional limitations in the Part B criteria: in understanding, remembering, or applying information, M.G.B. had a moderate limitation; in interacting with others, she had no limitation; in concentrating, persisting, or maintaining pace, she had a moderate limitation; in adapting or managing oneself, she had no limitation. Tr. 28.

Also at step three, the ALJ found that M.G.B. did not have an impairment of combination of impairments that functionally equaled the severity of the listings. *Id*. The ALJ found that M.G.B. had less than marked limitations in the functional equivalence domain of acquiring and using information, which she noted was the opinion expressed by Dr. Chandrasekhar. Tr. 32–33. In support of this conclusion, ALJ Pelligrino specifically noted that M.G.B. received "only limited support services" in her special education classes, that speech and language therapy had not been recommended by Ms. Singer or Ms. Reich, and that Ms. Falesto had recorded "mostly obvious to serious problems" which were, overall, "not at the marked level." Tr. 33. The ALJ also found that M.G.B. had less than marked limitation in the functional domain of attending and completing tasks, which she again noted was the opinion of Dr. Chandrasekhar. Tr. 34. In

support of this conclusion, the ALJ noted that Dr. Gandhi described M.G.B.'s symptoms of ADHD as "mild" at the consultative examination. *Id*. The ALJ also noted that "[t]he IEP report" indicated that M.G.B. was able to sustain attention and concentration and could sit still and focus on tasks at hand, though she did not specify which IEP contained these findings. The ALJ noted that Ms. Singer had observed "mild distractibility" during her evaluation and that "the teacher report suggested a slight issue, with a tendency to make careless mistakes." *Id*. Overall, the ALJ found that M.G.B. demonstrated "some serious problems" in this domain, but "again none would be at the marked level of limitation." *Id*.

The ALJ next concluded that M.G.B. had no limitation in the third domain, interacting and relating with others. Tr. 34–35. She cited in support of this finding Dr. Gandhi's conclusion that M.G.B. had less than marked limitation in this domain; Dr. Chandrasekhar's assessment that the most recent IEP showed no limitations in this domain; and Ms. Falesto's report indicating that M.G.B. had no problems in this domain. Tr. 35. As to the fourth domain, moving about and manipulating objects, the ALJ found that M.G.B. had no limitation. Tr. 36. In her discussion of this conclusion, the ALJ cited Dr. Gandhi's opinion that M.G.B. had less than a marked limitation in this domain, based on her need for occupational therapy at school and difficulties copying or writing. *Id*. The ALJ went on to say, "However, Dr. Chandrasekar found the claimant to have no limitations in this area," based on her review of the IEPs and the consultative examination finding no physical limitations. *Id*. As to the fifth domain, "caring for yourself," and the sixth domain, "health and physical well-being," the ALJ determined that M.G.B. had no limitations in these areas, stating, "No limitations were seen in [these] area[s] by Dr. Chandrasekhar or by Dr. Gandhi." Tr. 37. Based on the aforementioned, the ALJ concluded that M.G.B. did not have an impairment or combination of impairments that resulted in either marked

14

limitations in two domains of functioning or extreme limitation in one domain of functioning, and, therefore, was not disabled.  Tr. 37–38.

In reaching her determination as to the functional and medical equivalency of M.G.B.'s severe limitations, the ALJ gave "little weight" to the consultative examination report provided by Dr. Tsoutsouras, because "no actual opinion was provided in the report."  Tr. 31.  The ALJ gave "some weight" to the opinion of Dr. Gandhi, who found M.G.B. to have "no greater than a less than marked limitation in all pertinent domains," because Dr. Gandhi was a specialist with "extensive disability program knowledge" and because the findings were consistent with the evidence as a whole.  *Id*.  However, the ALJ also stated that Dr. Gandhi "appears to overstate the claimant's limitations, based on the evidence available to him at the time."  *Id*.  The ALJ gave significant weight to the opinion of Ms. Singer, the speech and language pathologist who examined M.G.B. and found no need for additional services, because it was "consistent with the medical evidence" and with the language evaluation completed by Ms. Reich.  *Id*.  The ALJ stated that the findings of Dr. Luo and Ms. Falesto were "noted."  *Id*.  The ALJ also noted that Ms. Falesto had opined that M.G.B. had only one limitation "at the very serious level that would correspond to a marked limitation in Social Security terminology."  *Id*.  The ALJ gave significant weight to the opinion of Dr. Chandrasekhar because her opinion was based on "a careful review of all the evidence," including M.G.B.'s IQ scores, and because of her expertise.  *Id*.  The ALJ concurred with Dr. Chandrasekhar's suggestion that Ms. Singer's assessment of M.G.B.'s language skills would be "more accurate" than the school IEP report from 2016.  Tr. 31–32.

Additional Evidence

After the ALJ's decision, M.G.B.'s IEP for the period of October 2018 to October 2019 was entered into the record.  The CSE again categorized M.G.B. as a student with a learning

15

disability.  Tr. 5.  The CSE stated that M.G.B., who was a third grade student, was reading at a first grade level and performing math and writing at a first grade level.  *Id*.  She had "difficulty verbally/orally participating [in] class discussion" and struggled in reading and math due to her difficulty comprehending written information.  *Id*.  Additionally, her vocabulary was delayed, her expressive language was below average, and her receptive and expressive social skills were below grade level.  *Id*.  her spelling skill was in the upper kindergarten grade level.  Tr. 6.  The CSE noted that M.G.B. was "motivated to work hard in class," loved working with other students, and had "more stamina when reading and writing," though she still needed "frequent breaks."  *Id*.  The CSE described M.G.B. as a kind, compassionate, and extremely empathetic girl and stated that her interpersonal skills were her "strength."  Tr. 7.  She continued to receive special classes in English and Math, with a 12:1:1 ratio.  Tr. 12.  She struggled to remember personal information from memory, such as her last name and address, and continued to require occupational therapy once a week to work on this skill as well as her writing, voice typing, and organizational skills.  Tr. 7, 12.

The Instant Motion

On November 6, 2018, Harry filed a request for review of the ALJ's decision, which the Appeals Council denied on November 1, 2019, making the ALJ's decision the final decision of the Commissioner.  Tr. 1–3.  This action followed.

In his motion for judgment of the pleadings, the Commissioner argues that the ALJ's determination is supported by substantial evidence in the record.  (Def.'s Mem (Doc. No. 14) at 13–20.)  At step three, the Commissioner argues, the ALJ properly found that M.G.B.'s impairments did not functionally equal any listed impairment, because the evidence supports the finding that M.G.B. had a less than marked limitation in the domains of acquiring and using

information and attending and completing tasks and no limitation in the other four domains. (*Id.* at 13–18.)

In her response in opposition to the Commissioner's motion and in support of her cross-motion for judgment on the pleadings, Harry argues that the ALJ erred in four respects, which together preclude a finding that the ALJ's decision was supported by substantial evidence. First, she argues that the ALJ failed to provide a full and fair hearing when she conducted only cursory examinations of Harry and of Dr. Chandrasekhar that fell below her heightened duty to develop the record of a *pro se* child claimant. (Pl.'s Mem. (Doc. No. 26) at 16–19.) Second, she argues that the ALJ failed to adequately develop the record because she did not make sufficient efforts to obtain updated school records, such as records from M.G.B.'s thrice-weekly therapy, the most recent IEP, or any of M.G.B.'s report cards. (*Id.* at 20–21.) Additionally, the ALJ only made two attempts to obtain records from M.G.B.'s treating physician, which falls below the standard of "reasonable efforts" required where the claimant is *pro se*. (*Id.* at 22–23.) Third, Harry argues that the ALJ failed to properly weigh the evidence, improperly discounting the opinion evidence of M.G.B.'s teachers and the school psychologist and inappropriately deferring to the opinion of Dr. Chandrasekhar. (*Id.* at 22–27.) She also argues that the ALJ credited one-on-one consultative examinations too heavily and failed to follow Social Security Ruling ("SSR") 09-2p and 20 C.F.R. § 416.924a(b)(6), both of which provide guidance for how to evaluate inconsistencies in functioning for children with ADHD across settings. (*Id.* at 27–28.) Fourth, Harry argues that the ALJ failed to acknowledge and discuss relevant evidence or explain why she implicitly rejected that evidence, such as failing to discuss Ms. Falesto's thorough assessment of M.G.B.'s functional limitations or to address M.G.B.'s need for support in a classroom setting. (*Id.* at 29–32.) Harry argues that these four errors, taken together, preclude a

17

finding that the ALJ's decision is supported by substantial evidence and, instead, require remand for further proceedings.  (*Id*. at 33.)

In his reply, the Commissioner argues that the ALJ adequately developed the record and provided M.G.B. a full and fair hearing, including offering Harry the opportunity to ask follow-up questions of Dr. Chandrasekhar during the 30-minute hearing.  (Def.'s Reply (Doc. No. 27) at 2–4.)  He also argues that the ALJ properly weighed the medical and non-medical opinions of record.  (*Id*. at 4–7.)  The consultative examiners' opinions were supported by other evidence in the record, including their own examination finding.  (*Id*. at 4–6.)  The ALJ also carefully reviewed Dr. Luo's examination findings, but the Commissioner notes that Dr. Luo did not opine as to the extent of M.G.B.'s limitations.  (*Id*. at 6.)  As to the non-medical opinion evidence, the Commissioner argues that the ALJ appropriately found that Ms. Falesto's overall assessment in the domain of acquiring and using information was that M.G.B. had an "obvious problem," which is consistent with less than marked limitations in this domain.  (*Id*.)  Finally, the Commissioner argues that the ALJ properly found that M.G.B.'s ADHD did not cause any limitations because M.G.B. had never been prescribed medication for this condition.  (*Id*. at 7.)

### STANDARD OF REVIEW

A final determination of the Commissioner of Social Security upon an application for SSI benefits is subject to judicial review as provided in 42 U.S.C. § 405(g).  *See* 42 U.S.C. § 1383(c)(3).  A court's review under 42 U.S.C. § 405(g) of a final decision by the Commissioner is limited to determining whether the Commissioner's conclusions were supported by substantial evidence in the record and were based on a correct legal standard.  *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009); *see Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).  The district court has the "power to enter, upon the pleadings and transcript of the record, a

judgment affirming, modifying, or reversing the decision of the Commissioner of Social

Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

"Substantial evidence" connotes "more than a mere scintilla.  It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971); *see also Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

"In determining whether substantial evidence supports a finding of the Secretary [now,

Commissioner], the court must not look at the supporting evidence in isolation, but must view it

in light of the other evidence in the record that might detract from such a finding, including any

contradictory evidence and evidence from which conflicting inferences may be drawn."  *Rivera*

*v. Sullivan*, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991).  The "substantial evidence" test applies

only to the Commissioner's factual determinations.  Similar deference is not accorded to the

Commissioner's legal conclusions or to the agency's compliance with applicable procedures

mandated by statute or regulation.  *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984).

"Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles,

application of the substantial evidence standard to uphold a finding of no disability creates an

unacceptable risk that a claimant will be deprived of the right to have her disability

determination made according to the correct legal principles."  *Johnson*, 817 F.2d at 986.

However, where application of the correct legal principles to the record could lead only to the

same conclusion reached by the Commissioner, there is no need to remand for agency

reconsideration.  *Zabala v. Astr*ue, 595 F.3d 402, 409 (2d Cir. 2010).

"[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to

develop a claimant's medical history even when the claimant is represented by counsel or by a

paralegal."  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir.1999) (internal alterations and quotation

19

marks omitted).  This duty to develop the record is of even greater importance when the claimant

is proceeding *pro se*; there, an ALJ "must 'adequately protect a *pro se* claimant's rights by

ensuring that all of the relevant facts are sufficiently developed and considered' and by

'scrupulously and conscientiously prob[ing] into, inquir[ing] of, and explor[ing] for all the

relevant facts.'"  *Moran v. Astrue*, 569 F.3d 108, 113 (2d Cir. 2009) (alterations in original)

(quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)).  "If there are gaps in the administrative

record or the ALJ has applied improper legal standards, the court will remand the case for further

development of the evidence."  *McClain v. Barnhart*, 299 F. Supp. 2d 309, 324 (S.D.N.Y. 2004).

## DISCUSSION

### I.      Failure to Develop the Record

"[A] hearing on disability benefits is a non-adversarial proceeding," and the ALJ, who is

tasked with ensuring the fairness of the proceeding, "generally has an affirmative obligation to

develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir.1996).  Under the

regulations, the Commissioner must develop the plaintiff's "complete medical history," and

make "every reasonable effort" to help the plaintiff get the required medical reports.  20 C.F.R. §

404.1512(d).  Where, as here, the claimant was not only unrepresented by counsel at the time of

the hearing but also acting on behalf of a minor, the ALJ's duty to develop the record is

"particularly acute."  *Encarnacion ex rel. George v. Barnhart*, 00-CV-6597 (LTS) (THK), 2003

WL 1344903, at *2 (S.D.N.Y. 2003).  "'Reasonable efforts,'" in the context of the heightened

duty to develop the record owed to a *pro se* claimant, requires that an ALJ do "more than merely

requesting reports from the treating physicians. It includes issuing and enforcing subpoenas

requiring the production of evidence, as authorized by 42 U.S.C. § 405(d), and advising the

plaintiff of the importance of the evidence. The ALJ must also enter these attempts at evidentiary

development into the record." *Jones v. Apfel*, 66 F. Supp. 2d 518, 524 (S.D.N.Y. 1999).  Failure

to sufficiently develop the administrative record results in the denial to claimant of a full and fair

hearing and is thus grounds for remand.  *See, e.g., Encarnacion*, 2003 WL 1344903 at \*4; *see*

*also Lopez v. Sec'y of Health & Human Servs.*, 728 F.2d 148, 150 (2d Cir. 1984); *Brown v.*

*Barnhart*, 02-CV-4523(SHS), 2003 WL 1888727, at \*8–9 (S.D.N.Y. 2003) (collecting cases),

*aff'd*, 85 F. App'x 249 (2d Cir. 2004) (summary order).

   Here, the ALJ failed to sufficiently develop the administrative record.  SSA regulations

"require adjudicators to try to get ... school records whenever they are needed to make a

determination or decision regarding a child's disability."  Social Security Ruling ("SSR") 09-

2p(IV): Title XVI: Determining Childhood Disability—Documenting a Child's Impairment-

Related Limitations, 74 Fed. Reg. 7525 (Feb. 18, 2009); *see also* 20 C.F.R. § 416.924a(a)(2)(iii)

("If you go to school, we will ask for information from your teachers and other school personnel

about how you are functioning on a day-to-day basis ...).  Here, the ALJ conducted the hearing

on October 1, 2018, and the most recent academic record was an IEP implemented the previous

year.  Failure to obtain updated school records, alone, is grounds for remand.  *See Estrella o/b/o*

*M.R.E. v. Berryhill*, 15-CV-6966 (CS)(LMS), 2017 WL 2693722, at \*21 (S.D.N.Y. June 22,

2017) (finding the ALJ failed to develop the record when the most recent school record was

prepared more than one year prior to the administrative hearing).  Moreover, the ALJ was on

notice that crucial school records were absent from the record and yet took no action to obtain

them.  At the administrative hearing, Harry testified that M.G.B. left her classroom to receive

speech therapy at school three times per week, and that she had a letter from the school speech

therapist that she had forgotten to bring.  The ALJ did not inform Harry during the hearing that

this letter was important or comment on its existence in any way.  The ALJ then stated in her

decision that M.G.B. had no limitations in the third domain, interacting and relating to others, based in part on the fact that neither Dr. Luo nor speech therapist Ms. Singer believed that speech therapy was needed.  Yet the absence of any records relating to M.G.B.'s speech therapy would seem to make a complete evaluation of M.G.B.'s spoken communication skills all but impossible.  The ALJ made no effort to learn who at M.G.B.'s school had decided that thrice-weekly speech therapy was needed, how long M.G.B. had been receiving speech therapy, or her progress in that area.  The lack of any speech therapy records, or updated school records, was an obvious gap in the record that the ALJ had an obligation to make reasonable efforts to remedy.  Failure to do so was error, warranting remand.

Harry also argues that the ALJ failed to develop the record, thus depriving M.G.B. of a full and fair hearing, when she made only two attempts to contact Dr. Jose Villarin, a doctor at New York-Presbyterian Hospital who had treated M.G.B.  The ALJ made the first attempt to obtain records from Dr. Villarin on June 8, 2018, and followed up on June 22, 2018, four months before the hearing.  Tr. 349–50.  There is no evidence that the ALJ served Dr. Villarin with a subpoena after the doctor failed to comply with her requests for those records.  Under the regulations, the Commissioner must make "every reasonable effort" to help the plaintiff get the required medical reports.  20 C.F.R. § 404.1512(d).  As set forth in the regulations, "every reasonable effort" requires making an initial request and at least one follow-up request to providers.  20 C.F.R. § 404.1512(b)(1)(i).  However, where a claimant is a minor who is proceeding *pro se*, the heightened duty to develop the record may require increased effort from the ALJ above and beyond these two requests.  *See, e.g., Jones*, 66 F. Supp. 2d at 524.  Upon remand, the Court encourages the ALJ to make additional efforts to obtain medical evidence from Dr. Villarin or other treating medical sources.

II.     **Failure to Provide a Full and Fair Hearing**

"Before examining the sufficiency of the evidence, the district court 'must … be satisfied that the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the [Social Security] Act.'" *Price ex rel. A.N. v. Astrue*, 42 F. Supp. 3d 423, 432 (E.D.N.Y. 2014) (quoting *Cruz*, 912 F.2d at 11).  Whether a claimant received a full and fair hearing depends on various factors, such as "whether the ALJ asked questions regarding the disposition and extent of the claimant's subjective symptoms, the number of witnesses, and the length of the transcript." *Estrella o/b/o M.R.E. v. Berryhill*, 15-CV-6966 (CS)(LMS), 2017 WL 2693722, at *22 (S.D.N.Y. 2017).

Here, the Commissioner argues that the ALJ provided a full and fair hearing because both Harry and Dr. Chandrasekhar were given sufficient time to testify, and Harry had the opportunity to ask follow-up questions of the doctor.  It is true that the hearing lasted just shy of 30 minutes and produced a 24-page transcript, which is not unusually short.  However, as discussed above, the ALJ failed to ask Harry about several pertinent topics, such as M.G.B.'s receiving speech therapy three times a week.  Indeed, when Harry said that she had a letter from the school speech therapist, the ALJ changed the subject to whether M.G.B. had behavioral problems.

Further, Dr. Chandrasekhar's testimony is vague and confusing, and the ALJ failed to ask clarifying questions in the face of her contradictory assertions.  For example, Dr. Chandrasekhar stated that the records did not provide her with enough information to come to a determination as to whether M.G.B. had a severe impairment with regards to her IQ but stated in the very next sentence that M.G.B. had a severe impairment due to her low IQ.  Tr. 62.  Dr. Chandrasekar then stated that M.G.B. had less than marked limitations in the area of attending and using information "because of the low IQ," Tr. 63, having testified just minutes before that "I cannot

be very sure what her IQ is," Tr. 62.  The ALJ asked no questions to clarify this baffling

testimony.  The ALJ then asked evaluate M.G.B.'s functional limitations in the domain of

attending and completing tasks, which the doctor stated was "less than marked for the same

reason."  Tr. 64.  The ALJ again asked no follow-up questions to determine what precisely this

reason was.  Though the Commissioner is correct that Harry had the opportunity to ask questions

of Dr. Chandrasekhar and did not do so, the duty to "scrupulously and conscientiously probe

into, inquire of, and explore for all the relevant facts," *Cruz*, 912 F.2d at 11, remained with the

ALJ, and she failed to do so here.

### III.   Sufficiency of the Evidence

The Court will not discuss whether the evidence is sufficient overall to support a

determination that M.G.B. is or is not disabled because the ALJ will necessarily need to reweigh

the newly developed record upon remand.  However, the Court notes that the ALJ incorrectly

stated in her decision that Ms. Falesto's evaluations contained few limitations "at the very

serious level that would correspond to a marked limitation in Social Security terminology."  Tr.

31.  This is a misstatement of law.  The regulations define "marked limitation" as when a child's

impairment "interferes seriously" with her ability to initiate, sustain, or complete activities

independently, 20 C.F.R. § 416.926a(e)(2); a child's impairment is an "extreme limitation" when

it "interferes very seriously" and is "more than marked," 20 C.F.R. § 416.926a(e)(3).

### CONCLUSION

Federal regulations explicitly authorize a court reviewing decisions of the SSA to order

further proceedings when appropriate.  42 U.S.C. § 405(g) ("The court shall have power to enter,

upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing

the decision of the Commissioner of Social Security, with or without remanding the cause for a

rehearing."). Remand is warranted where "there are gaps in the administrative record or the ALJ has applied an improper legal standard." *Rosa v. Callahan*, 168 F.3d 72, 82–83 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)) (internal quotation marks omitted). Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision. *Pratts*, 94 F.3d at 39. However, if the record before the Court provides "persuasive proof of disability … a remand for further evidentiary proceedings would serve no purpose," and the Court may reverse and remand solely for the calculation and payment of benefits. *See, e.g.*, *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980); *Kane v. Astrue*, 942 F. Supp. 2d 301, 314 (E.D.N.Y. 2013).

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied, and Harry's motion for judgment on the pleadings is granted to the extent it seeks remand. This matter is remanded to the Commissioner of Social Security for further proceedings consistent with this Memorandum and Order. The Clerk of Court is respectfully directed to enter judgment in accordance with this Memorandum and Order and to close this case.

SO ORDERED.

Dated:  Brooklyn, New York
       August 3, 2021

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
United States District Judge